Corrected

# In the United States Court of Federal Claims

No. 15-342
Filed: November 13, 2025
FOR PUBLICATION

---

INTER-TRIBAL COUNCIL OF
ARIZONA, INC.,

                    *Plaintiff,*

v.

UNITED STATES,

                    *Defendant.*

---

*Melody L. McCoy*, Native American Rights Fund, Boulder, CO, for the plaintiff.

*Alexis M. Daniel*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, with *Dondrae N. Maiden* and *Karen F. Boyd*, Department of the Interior, of counsel, for the defendant.

**MEMORANDUM OPINION**

***HERTLING*, Judge**

In this Indian breach-of-trust case, the plaintiff, Inter-Tribal Council of Arizona, Inc. ("ITCA"), is a nonprofit consortium of 19 federally recognized tribes in Arizona. ITCA has sued the United States, acting through the U.S. Department of the Interior ("DOI"). DOI administers a trust fund for the benefit of the plaintiff and its 19 member tribes, as required by a congressionally ratified land exchange. Among other claims, ITCA alleges that DOI breached its fiduciary duties by failing to maintain adequate security in the federally administered trust fund. The parties have filed cross-motions for partial summary judgment on this claim.

In 1988, DOI and Barron Collier Company ("Collier") agreed to a land exchange. Collier exchanged property it owned in Florida for property owned by the United States in Phoenix, Arizona. Because the Phoenix property was worth more than the Florida property, Collier also agreed to pay the United States $34.9 million as part of the exchange. The land exchange between the defendant and Collier was effectuated through the Arizona-Florida Land Exchange Act ("AFLEA" or "the Act"), Pub. L. No. 100-696, 102 Stat. 4577, tit. IV (1988). The Act earmarked the $34.9 million Collier was to pay to a trust fund designed to compensate the Arizona tribes for the loss of the Phoenix Indian School, which had been located on the Phoenix site being traded to Collier. The Act provided the Secretary of the Interior ("the Secretary") with the option to collect the $34.9 million, either as a lump sum at the close of the transaction or over 30 years, but the Secretary had to consult with the affected Arizona tribes before making his

decision.  The Act mandated the execution of a Trust Fund Payment Agreement ("TFPA") if Collier and DOI elected the 30-year payment option, which they did.  Collier and DOI executed the TFPA at the end of 1992.  The TFPA called for Collier to make 30 annual payments into the trust fund to benefit the Arizona Indian tribes.[1]  According to the TFPA, Collier was to pay into the trust fund 30 annual interest payments of $2.9 million and 30 annual payments that would equal the lump sum of $34.9 million into an annuity held by a third party; the annuity would be deposited into the trust fund at the end of 30 years.  The TFPA also required that Collier provide a defined amount of collateral to secure its payment obligations under the agreement.

In January 2013, after making 15 of the 30 annual payments, Collier notified DOI that it no longer intended to meet its payment obligations.  In 2014, after DOI had requested that Collier adhere to its obligations under the TFPA, the defendant sued Collier in the United States District Court for the District of Arizona.  In a settlement executed in 2017, the United States recovered the full $34.9 million principal payment and an additional $14.5 million, to cover the unpaid annual interest payments for the five years between 2012 and 2016.

In April 2015, while the defendant's suit against Collier was pending, ITCA brought this action.  The operative second amended complaint (ECF 58) contains three claims.  Claim I alleges that DOI breached its fiduciary obligations regarding the Act's requirements to hold adequate security for the amounts owed to the trust fund.  Claim II alleges that DOI breached its fiduciary obligations to collect, deposit, and make trust fund payments required by the Act.  Claim III alleges that DOI breached its fiduciary obligations to invest prudently and account properly for the trust fund before and after the settlement with Collier.

In 2018, Judge Firestone dismissed Claims I and II for failure to state a claim upon which relief can be granted and dismissed a portion of Claim III as untimely.  *Inter-Tribal Council of Ariz., Inc. v. United States* ("*ITCA I*"), 140 Fed. Cl. 447, 460 (2018).  Plaintiff then appealed the dismissal of Claims I and II to the Federal Circuit.  The Federal Circuit affirmed the dismissal of Claim II.  On Claim I, the Federal Circuit affirmed in part but vacated in part.  *Inter-Tribal Council of Ariz., Inc. v. United States* ("*ITCA II*"), 956 F.3d 1328 (Fed. Cir. 2020).  On Claim I, the Federal Circuit remanded for a determination of whether DOI had breached its fiduciary obligations under the Act's trust-fund-payment security requirements.  After three rounds of summary judgement motions, all that remains is a single paragraph of Claim I, *viz.*, whether "[t]he United States' failure to have sufficient security in the trust estate when Collier defaulted was a breach of trust in violation of the Act."  (ECF 58 at ¶ 263.)

DOI's fiduciary duty, derived from AFLEA, was satisfied when the defendant sued Collier *in rem* and collected damages accounting for the entire $34.9 million lump sum and the missed annual interest payments that had accrued at the time of the district court litigation.  The defendant has no other obligations under the Act.  Accordingly, the defendant's motion for partial summary judgment is granted, and the plaintiff's motion for partial summary judgment is denied.

---

[1] The beneficiaries of the trust fund are the plaintiff and its 19 member tribes, which receive 95 percent of the benefits, and the Navajo tribe, which receives five percent of the benefits.

## I.     FACTUAL BACKGROUND[2]

From 1891 until 1990, DOI operated the Phoenix Indian School, an off-reservation elementary and secondary boarding school in Phoenix, Arizona for Native American children. The school was located on land owned by the United States. (ECF 187 at ¶ 3.)  In the 1970s, DOI began transitioning away from operating off-reservation boarding schools.  In 1984, DOI wanted to add property in Florida owned by Collier to a national wildlife refuge.  DOI, however, lacked the funds to purchase Collier's Florida property.  DOI therefore proposed swapping the Phoenix Indian School property for Collier's Florida property.  In 1988, the United States and Collier agreed to the exchange, which was ratified by Congress through the enactment of AFLEA.  (*Id.* at ¶ 1.)

Because the Arizona land was worth more than the Florida land, Collier agreed to pay the difference in value, $34.9 million, to the United States. (*Id.* at ¶ 4.)  Collier was allowed to pay this sum as either a single lump-sum payment at the closing of the land exchange or to make annual contributions to an annuity and make annual interest payments over 30 years. (*Id.* at ¶¶ 4-5.)  The United States was to hold any amounts received from Collier in trust if the lump sum was received upfront.  If Collier paid the lump sum upfront, the Act required the Secretary to invest "in interest-bearing deposits and securities in accordance with the Act of June 24, 1938 (25 U.S.C. § 162a) . . . any portion of the Trust income not used by [the government] in any year."  AFLEA, § 405(c)(1).

If Collier paid the purchase price over 30 years, the United States was to hold the annual interest payments in trust.  Collier was also required to enter an agreement with a third-party financial institution, that was to hold, in an annuity, annual payments made by Collier toward the $34.9 million lump sum.  Ninety-five percent of these interest payments made to the United States were allocated to the Arizona InterTribal Trust Fund for the benefit of the plaintiff and its 19 member tribes to fund educational and child-welfare programs, with the remaining five percent allocated to the Navajo tribe.[3]  *See* AFLEA, §§ 401(2), 403(a), 405(c)(2), 405(d), 405(e)(1).  The third-party financial institution would pay the United States the lump sum of $34.9 million at the end of the 30-year agreement, and the United States would then allocate that money to the Arizona InterTribal Trust Fund.  (ECF 154-1 at 14.)  If the trust fund payments were made in the form of 30 annual payments, the United States was required to "hold in trust the security provided in accordance with the [TFPA]" and, at the direction of the Secretary, was authorized to "invest in accordance with the requirements of paragraph (1) any portion of the Trust Income not used by the Secretary in any year."  § 405(c)(2)-(3).  AFLEA mandated the

---

[2] The material facts are not in dispute.  On April 19, 2024, the parties submitted a Joint Statement of Undisputed Facts.  (ECF 154.)  Both parties additionally submitted Statements of Undisputed Facts in support of their current cross-motions. (ECF 183; ECF 185.)  The plaintiff also submitted a response to the defendant's Statement of Undisputed Facts.  (ECF 187.)  The summary of facts does not constitute findings of fact but is simply a recitation of undisputed facts.  To the extent any facts remain disputed, they are not material to the resolution of the cross-motions for summary judgment.

[3] Although the plaintiff here is the Inter-Tribal Council of Arizona, the trust fund created in AFLEA is called the Arizona InterTribal Trust Fund, dropping the hyphen from Inter-Tribal.  The plaintiff is referred to as ITCA, and the trust fund is referred to with the name Congress gave it.

execution of a TFPA to facilitate the deposit of annual payments if Collier elected the 30-year payment option.  AFLEA, § 405(c)(2).

Collier elected to accept DOI's offer to pay for the Arizona land in 30 annual installments at the end of 1991.  (ECF 183 at ¶ 13; ECF 185 at ¶ 57.)  According to an internal 1992 DOI memorandum, the Indian tribes initially preferred the lump-sum payment upfront over the 30-year payment option, but eventually "supported the 30-year option as an alternative to letting the Exchange die."  (ECF 184-3 at 3.)  Throughout 1992, Collier and DOI negotiated the TFPA. (*Id*.)  In May and December of 1992, the Assistant Secretary for Indian Affairs and Assistant Secretary for Fish and Wildlife and Parks prepared internal memoranda discussing various issues arising from the land exchange.  (ECF184-3; ECF 184-5.)  One of the memoranda addressed the scope of the TFPA and whether the 30 annual interest payments and the lump-sum principal payment are two separate contractual obligations or a traditional financing arrangement.  (ECF 184-3.)  The second, later memorandum, addressed the sufficiency of the collateral provided by Collier.[4]  (ECF 184-5.)

At the end of 1992, following extended negotiations, Collier and the defendant executed the TFPA, which incorporated a promissory note and deed of trust.  (ECF 187 at ¶ 14.)  The promissory note required Collier to pay the United States a "Principal Amount" of $34.9 million, payable in 30 annual payments.  (ECF 183-1 at 67.)  These payments were to be made into an annuity ("the trust fund" or "trust estate") held by a private bank.  (*Id*.)  Collier also had to make 30 "Annual Interest Payments" of $2.9 million each year to the trust fund.  (*Id*.)  The annual interest payments reflected an interest rate of 8.5 percent annually on the Principal Amount. (ECF 183-1 at 70.)  AFLEA required that annual interest payments be at a rate no lower than 8.5 percent.  AFLEA, § 405(c)(5).

The TFPA included a clause that prohibited Collier from prepaying or paying off the Principal Amount or the annual interest payments early.  ((ECF 183-1 at 68.)  The TFPA also precluded personal liability.  (ECF 183-1 at 68.)  If Collier defaulted on its obligations under the TFPA, DOI could only proceed *in rem* against the security held in the trust fund, as defined in the promissory note.  (ECF 183-1 at 68-69.)

At the time the TFPA was executed, the promissory note was secured with collateral that consisted of: (1) the Phoenix Indian School property (now owned by Collier); (2) liens on Collier development rights; (3) liens on Collier-owned properties in Phoenix; and (4) deposits made by Collier into the annuity account.  (ECF 154 at ¶¶ 5-6.)  The deed of trust required DOI to grant Collier a release from any of the liens so long as the value of the collateral remaining in the trust estate equaled or exceeded 130 percent of a defined release-level amount.  (*Id*. at ¶¶ 8, 11.)  The release-level amount was defined in the deed of trust as "(i) the unpaid principal plus accrued interest on the Promissory Note, less (ii) the value of United States Government-backed

---

[4] While the plaintiff provided three memoranda as Exhibits B, C, and D (ECF 184-3, ECF 184-4, and ECF 184-5) to its motion for partial summary judgment, the memorandum at Exhibit C (ECF 184-4) is a draft of the memorandum at Exhibit D (ECF 184-5), with only minor differences between the two.  Therefore, this opinion references only the two memoranda at Exhibit B and D.

Securities and Deposited Monies held in the Trust Estate, and further less, . . . (iii) the fair value, at the time of the calculation, of the Annuity." (*Id.* at ¶ 12.)

Collier made its required annual principal and interest payments into the trust fund ("trust fund payments") from 1997 until 2011. (*Id.* at ¶ 36.) In both 1998 and 2007, Collier requested releases of liens on property in the trust estate. (ECF 187 at ¶¶ 35, 41.) With each request, Collier provided appraisals of the remaining property DOI held in trust; Collier's appraisals showed that the security remaining in the trust estate after release would be valued above the release-level amount. (ECF 154 at ¶¶ 20, 28.) DOI determined that the appraisals were sufficient evidence to satisfy the requirements of the Act and released Collier from the requested liens in both 1998 and 2007. (*Id.* at ¶¶ 21, 29.) Sometime after DOI agreed to the second lien release, the value of the security remaining in the trust fell below the release-level amount. *See United States v. Barron Collier Co.*, No. CV-14-00161-PHX-GPR, 2016 WL 3537802, at *5 (D. Ariz. 2016).

In December 2012, representatives from Collier met with DOI officials to discuss the decreasing value of the Phoenix Indian School property and the difficulties Collier was having meeting its annual payment obligations to the trust fund. (ECF 183-5.) Collier failed to pay its principal and interest payments for 2012. (ECF 187 at ¶ 47.) In January 2013, Collier notified DOI that it did not intend to make any additional payments to the trust fund under the TFPA. (ECF 183-5.) At the time of Collier's notification, Collier had paid into the trust fund 15 annual interest payments, totaling $44,497,500, and 15 principal payments, totaling $9,662,000. (*Id.*) DOI responded by requesting that Collier make the required payments and add collateral to the trust estate. (ECF 183-6.) At the time Collier breached its TFPA obligations, 15 annual interest payments and the same number of unpaid annuity payments that would make up the $34.9 million lump sum at the end of the 30-year agreement, remained to be paid. (ECF 154 at ¶ 36; ECF 187 at ¶¶ 46-47.)

In 2014, the United States sued Collier in district court in Arizona. The suit sought either specific performance of the requirement that Collier maintain adequate collateral in the trust estate or, alternatively, the imposition of a constructive trust on Collier's interests in the properties for which DOI's liens had been released in 1998 and 2007. (ECF 154 at ¶ 45.)

In July 2017, the United States and Collier executed a settlement agreement reflecting Collier's unpaid principal obligation and five outstanding annual interest payments between 2012 and 2016. (ECF 183 at ¶¶ 59, 69; ECF 185 at 111, 113, 117.) The total estimated recovery by the United States under the settlement was $54.5 million, comprised of $16 million in cash, $13.5 million in annuity investments, and the Phoenix Indian School property, which was appraised to be worth $25 million. (ECF 187 at ¶¶ 62-64.) The General Services Administration sold the Phoenix Indian School property for $18.5 million. Thus, the total realized value of the settlement was approximately $48 million. (*Id.* at ¶ 67.) DOI currently holds the cash received from the settlement in trust. (ECF 183 at ¶ 68; ECF 185 at ¶ 118.)

The money recovered in the settlement did not account for all the remaining annual interest payments that would have been due through 2026 under the terms of the initial 30-year payment plan. (ECF 154 at ¶¶ 48-52.) Under the original TFPA, ITCA would have received approximately $122.5 million in principal and interest payments. ITCA alleges it has received

far less than this amount and sues for the difference between $122.5 million and the amount that has been paid into the trust fund.

## II.    PROCEDURAL HISTORY

ITCA filed suit on April 2, 2015, after the United States had sued Collier in district court but before the settlement agreement was executed.  (ECF 1.)  The parties have engaged in briefing on several motions to dismiss and attempted to resolve the dispute through alternative dispute resolution.  Since the remand by the Federal Circuit, the parties have engaged in briefing on several cross-motions for summary judgment.

The operative complaint is the Second Amended Complaint ("SAC").  (ECF 58.)  The SAC alleges three claims for relief; only the first is at issue in these cross-motions.

In Claim I of the SAC, the plaintiff alleges that the defendant failed to require adequate security when negotiating the TFPA, and that the defendant was required "to hold sufficient security both for the $34.9 million final payment and for all 30 years of $2.9 million annual payments which could not be prepaid."  (*Id.* at ¶¶ 254-67.)  ITCA further alleges that the defendant's failure to have adequate security in the trust estate in 1998, 2007, and 2011 was a breach of trust.  In addition, ITCA alleges that the defendant failed to recover from Collier sufficient security in settlement of the defendant's suit.  Finally, ITCA alleges that the Treasury Department, rather than DOI, should have held the security in trust.  (*Id.*)

As relief specific to Claim I, the plaintiff seeks ITCA's allocation of the $34.9 million final payment, all remaining unpaid annual $2.9 million payments, and the difference between the actual return on the recovered $34.9 million principal payment and the statutory minimum rate of return of 8.5 percent.  (*Id.* at ¶ 268.)

In Claim II of the SAC, the plaintiff alleged that the defendant breached its fiduciary duty by failing (1) to collect the full amount of the payments due from Collier; (2) to make the payments to ITCA on Collier's behalf; and (3) to invest the payments on which Collier defaulted. (*Id.* at ¶¶ 270-74.)  ITCA alleged that the defendant has "the obligation . . . to make in full the trust fund payments required under the Act for the annual payment method's entire thirty-year period."  (*Id.* at ¶ 272.)  As relief for this claim, the plaintiff sought ITCA's allocation "of the fifteen $2.9 [million] annual payments unpaid beginning in 2012," and the "lost earnings" on those amounts.  (*Id.* at ¶ 275.)

In Claim III of the SAC, the plaintiff alleged that the defendant breached its fiduciary obligations to invest ITCA's allocation of the unpaid annual $2.9 million interest payments prudently and failed to account properly for the trust fund payments.  (Id. at ¶¶ 277-78.)

On the defendant's motion to dismiss, Judge Firestone dismissed Claims I and II entirely for failure to state a claim and dismissed a portion of Claim III as untimely.  *ITCA I*, 140 Fed. Cl. at 460.  Judge Firestone held that the parts of Claim I regarding the negotiations of the TFPA were time-barred, and the rest of the claim did not constitute a basis upon which relief could be granted because the United States had already successfully sued Collier to recover the $34.9 million principal payment and the five missed annual $2.9 million interest payments.  *Id.* at 455-57.

Claim II was dismissed because AFLEA does not impose any obligation on DOI to make payments in the event of Collier's default. *Id.* at 458. The deed of trust "only imposed on the government the obligation to ensure that Collier held sufficient security to meet the 130 percent of the Release Level Amount in the event that a lien was released." *Id.* Additionally, the "government did not ignore this obligation because it sued Collier to force Collier to provide sufficient security pursuant to the Deed of Trust." *Id.* Most crucially, Judge Firestone held: "The government was not required to do more and is not liable for any deficiencies in Collier's annual interest payments." *Id.*

Claim III was dismissed in part. Judge Firestone found that, to the extent ITCA challenged investment decisions made more than six years prior to the filing of the original complaint, the claim was untimely. *Id.* at 458-60. As for the portion of Claim III alleging violation of the defendant's fiduciary obligations over improper investments made within the six years prior to the complaint, the claim was allowed to proceed. Judge Firestone then entered partial judgment on the dismissal of Claims I and II to allow ITCA to appeal.[5]

On the plaintiff's appeal, the Federal Circuit reversed part of the dismissal of Claim I and affirmed the dismissal of Claim II. *ITCA II*, 956 F.3d at 1344, 1346.

Regarding Claim II, the Federal Circuit held that it "fails to state a claim upon which relief can be granted." *Id.* at 1345. The Federal Circuit recited the plaintiff's allegation that the United States had not collected or made any annual or final trust fund payments since 2011 and held that there was no "support in the AFLEA, case law, or otherwise, for the imposition of a duty consistent with this allegation." *Id.* At most, AFLEA imposed a duty on Collier, not the United States. *Id.* As a result, DOI, as trustee, was not the guarantor of Collier's obligation and could not be held liable to cover Collier's unpaid obligations under the TFPA upon Collier's default.

As for Claim I, however, the Federal Circuit held that the dismissal of a "portion" of Claim I had been in error. *Id.* at 1340. The Federal Circuit found that section 405(c)(2) of AFLEA, which requires the United States to "hold in trust the security provided in accordance with the [TFPA]," imposed a specific fiduciary duty on the United States to maintain adequate security in the trust estate for the benefit of ITCA. *Id.* at 1341-42. The Federal Circuit highlighted several allegations relevant to the fiduciary duty to hold the proceeds of the sale of the Phoenix Indian School in trust. The Federal Circuit found the claim that the defendant failed to provide ITCA with timely notice of its decisions in 1998 and 2007 to release the liens was viable. *Id.* at 1342-43. The defendant had conceded in the Arizona district court litigation that Collier's debt had become under-collateralized after the 1998 and 2007 lien releases. *Id.* Despite this under-collateralization, the defendant did not demand Collier provide additional security until 2013. *Id.* The Federal Circuit also found viable the claims that the defendant had failed to perform an independent appraisal of the Phoenix Indian School property before releasing the liens. *Id.* The Federal Circuit held that "[i]f proven, ITCA's allegations would demonstrate a breach of the Government's fiduciary duty to 'hold in trust the security' against Collier's payment obligations, including the duty to preserve the property held in trust." *Id.* at

---

[5] The allegations of Claim III that remain viable and pending were stayed prior to appeal (ECF 87) and remain stayed pending final resolution of Claim I. (ECF 120.)

1343.  The Federal Circuit noted that it was "particularly troubling" that, in 2007, only real property remained in the trust estate when the TFPA allowed only for *in rem* recourse against the trust estate held in security by the United States in case of Collier's default.  *Id.*  The Federal Circuit also determined that AFLEA could be fairly interpreted as mandating compensation for a breach.  *Id*. at 1344.

Because AFLEA establishes a fiduciary duty owed by the defendant to ITCA and can be "fairly [ ] interpreted as mandating compensation by the . . . government for damages sustained," the Federal Circuit reversed the dismissal of the "failure-to-maintain-sufficient-security portion of Claim I."  *Id.* at 1344.  The case was remanded to determine how much collateral AFLEA required DOI to hold and whether DOI breached its fiduciary duty to hold the required amount of collateral in trust.

After remand and further unsuccessful settlement discussions, the case was transferred to the undersigned.  (ECF 122.)  In 2023, the parties filed cross-motions for partial summary judgment (ECF 129; ECF 137) on the remanded Claim I counts (ECF 58 ¶¶ 255-268(c)).  The defendant's motion was granted in part, and the claims in paragraphs 255-59, 264-67, 268(a), and 268(b) of the plaintiff's pending second amended complaint were dismissed.  *Inter-Tribal Council of Ariz., Inc. v. United States ("ITCA III")*, No. 15-342, 2023 WL 4881967 (Fed. Cl., Aug. 1, 2023).  The plaintiff's motion for partial summary judgment (ECF 137) was denied.

The defendant's motion was mostly granted and ITCA's motion denied based on the Federal Circuit's conclusion that the defendant is not liable for any deficiencies in Collier's annual interest payments.  *ITCA II*, 956 F.3d at 1345-46.  Under this holding, ITCA's effort to recover from the United States the outstanding $2.9 million in annual interest payments owed by Collier under the TFPA was rejected.  *ITCA III*, 2023 WL 4881967, at *6-7.  As for ITCA's claim for breach of trust attributable to a private bank and not the Treasury Department holding the trust, the plaintiff had failed to raise the issue on appeal and could not sufficiently show it was harmed by the defendant's actions, this portion of the claim was also rejected.  *Id*.

Not all the bases for damages alleged in Claim I were rejected, and aspects of the defendant's motion for summary judgment were denied.  The defendant had argued that it had discharged its fiduciary obligations in full by suing Collier in district court and recovering $48 million for the trust estate.  As a result, the defendant had argued that it was entitled to judgment on all of Claim I.  This argument was rejected because the Federal Circuit's decision implied that other facts were relevant to determining if the defendant had breached any fiduciary duty owed to ITCA.  *Id*. at *10

Remaining viable after the parties' cross-motions were resolved were claims as to "whether the defendant complied with specific express provisions in the Deed of Trust, and [ ] whether the defendant maintained an adequate amount of security in the Trust Estate according to common-law principles."  *Id*.  As to these two issues, neither party had provided sufficient uncontested evidence to support a conclusion.  *Id*.  Accordingly, still pending after the initial

summary judgment motions after remand were ITCA's claims raised in paragraphs 260-263 of the SAC; all other allegations from Claim I of the SAC were rejected.[6]

In 2024, the parties filed cross-motions for summary judgment on the remaining viable allegations in Claim I. (ECF 155; ECF 157.) Oral argument was held on August 7, 2024. At the conclusion of the argument, the defendant's motion for summary judgment on Claim I was orally granted in part. The claims in paragraphs 260-262 of the SAC were rejected. The motion was denied as to paragraph 263. The plaintiff's motion for partial summary judgment was denied. Paragraphs 260-262 raised claims related to the defendant's release to Collier of security held in trust in 1998 and 2007. The evidence showed that in both 1998 and 2007 the trust was sufficiently secured when DOI agreed to release a portion of the estate. Summary judgment for the defendant was proper as to these allegations. The allegation in paragraph 263 of the SAC, that the defendant did not hold enough security in the trust fund when Collier defaulted, was found to remain viable, and summary judgment was denied as to this one remaining allegation of Claim I.

Pending now are the parties' renewed cross-motions for partial summary judgment on the allegations of paragraph 263 of the SAC. (ECF 182; ECF 184.) The motions are fully briefed, and oral argument was held on September 30, 2025.

## III.    JURISDICTION

The Tucker Act, 28 U.S.C. § 1491(a)(1), gives the Court of Federal Claims jurisdiction over claims for damages against the United States:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

The Indian Tucker Act, 28 U.S.C. § 1505, "confers a like waiver for Indian tribal claims that 'otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe.'" *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (quoting the statute). "[N]either the Tucker Act nor the Indian Tucker Act creates substantive rights; they are simply jurisdiction provisions that operate to waive sovereign immunity for claims premised on other sources of law (e.g., statutes or contracts)." *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009). To invoke the jurisdiction of the Court of Federal Claims under the Indian Tucker Act, a plaintiff tribe must therefore identify a substantive source of law that establishes a specific fiduciary duty and allege that the United States has failed to satisfy its obligations under that fiduciary duty. *Id*.

---

[6] Paragraphs 260-63 of the SAC include claims that the defendant's failure to have sufficient security in the trust estate to allow the partial releases of security in 1998, 2007, and at the time of Collier's default was a breach of trust, as was the defendant's failure to address the shortfall in the security attributable to the economic downturn of 2008.

"A statute or regulation that recites a general trust relationship between the United States and the Indian People is not enough to establish any particular trust duty." *Hopi Tribe v. United States*, 782 F.3d 662, 667 (Fed. Cir. 2015). "The Government assumes Indian trust responsibilities only to the extent it expressly accepts those responsibilities by statute." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 177 (2011). A tribal plaintiff must also show that the relevant source of substantive law "can be fairly interpreted as mandating compensation for damages sustained as a result of a breach of the duties." *Navajo Nation*, 556 U.S. at 291.

The Federal Circuit has already determined that AFLEA "defines a fiduciary relationship" by mandating that the United States was to "hold in trust" security, at a level adequate to secure Collier's payment obligations for the plaintiff's benefit. *ITCA II*, 956 F.3d at 1341 (citing *White Mountain Apache Tribe*, 537 U.S. at 474). ITCA's allegations, if proven, would show that DOI breached its fiduciary duty to hold in trust security for Collier's obligations and to preserve it. *Id*. at 1343. The Federal Circuit has also determined that AFLEA can be fairly interpreted as mandating compensation for DOI's fiduciary wrongs. *Id*. at 1344. "Accordingly, the portion of Claim I that arises from the DOI's alleged breach of its fiduciary duty to 'hold in trust the security' against Collier's payment obligations, [ ] states a claim over which the Court of Federal Claims has jurisdiction, and upon which relief can be granted." *Id*.

## IV.    STANDARD OF REVIEW

Under RCFC 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are inappropriate at the summary-judgment stage. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). An issue is "genuine" only if it "may reasonably be resolved in favor of either party," and a fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248-50

The moving party bears the burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "'[T]he inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (alteration in original) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)).

The same standard applies when the parties have cross-moved for summary judgment. *See Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962, 968-69 (Fed. Cir. 2009). A court is not obligated to grant summary judgment for either side; "[r]ather, the court must evaluate each motion on its own merits. . . ." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987). If a genuine issue of material fact exists as to both cross-motions, a court must deny both motions. *Marriott*, 586 F.3d at 969.

## V.    DISCUSSION

In support of its pending motion for summary judgment, the plaintiff argues, as it consistently has, that DOI, as trustee of the Arizona InterTribal Trust Fund, owed a fiduciary duty to ITCA to hold sufficient security in the trust fund. ITCA alleges that DOI had to hold

enough collateral to ensure that ITCA would receive the full value of its 95 percent share of the $34.9 million lump sum final principal payment and all 30 years of annual interest payments. The plaintiff argues that because DOI failed to hold enough collateral in the trust fund to secure the entirety of Collier's obligation, DOI is obligated to make up the difference between the sum of the amount Collier paid and the amount the defendant recovered in its suit against Collier and the amount Collier would have paid into the trust fund had it not defaulted. Specifically, ITCA expected to receive annual interest payments of $2.9 million through 2026. After the defendant collected damages from Collier in 2017, the annual interest payments earned by the trust fund have not returned the 8.5 percent rate required to maintain $2.9 million annually.

### A.    Reconsideration of 2023 Summary Judgment Decision

In 2023, when the parties filed their first set of cross-motions for summary judgment on Claim I after remand, the plaintiff's argument was not clearly explained and therefore not fully understood or appreciated. The plaintiff was understood to be pursuing effectively the same argument that the Federal Circuit had rejected, that the defendant was the "guarantor" of Collier's payments. It appeared that the plaintiff was arguing that AFLEA imposed a fiduciary obligation on the defendant that effectively made it the guarantor of Collier's obligations under the TFPA. That argument was rejected when the first set of cross-motions for summary judgment after remand was resolved. On the second round of summary judgment briefing, the plaintiff reiterated its position, which was again rejected. Now, on the third round of summary judgment briefing, the full contours of the plaintiff's argument for imposing liability on the defendant under Claim I have become clearer.

The lack of clarity in the plaintiff's argument over Claim I in 2023 resulted in the dismissal of the claims raised in paragraphs 255-59, 264-67, 268(a), and 268(b) of the SAC in a way that did not thoroughly address the nature and scope of the plaintiff's contentions.[7] *See ITCA III*, 2023 WL 4881967. It is now clearer that the argument advanced by ITCA to impose a fiduciary duty on the defendant and hold it liable for the shortfall in the trust fund is separate and distinct from the "guarantor" argument. As a result, the analysis here will address not only the remaining claim of paragraph 263 of the SAC but also more thoroughly engage with the arguments first presented by the plaintiff in 2023.[8] Despite this reconsideration of the plaintiff's arguments under Claim I of the SAC, the outcome is the same. Under AFLEA, the defendant has

---

[7] Paragraphs 255-59 of the SAC allege the defendant's negotiation and implementation of the TFPA as incongruent with its obligations under the Act to hold sufficient collateral to secure all 30 years of annual interest payments. Paragraph 264 of the SAC alleges the defendant failed to recover sufficient security in the settlement of its claims against Collier to make the trust fund whole. Paragraphs 265-67 of the SAC allege the defendant breached and continues to breach ongoing fiduciary duties related to the sale of the Phoenix Indian School property. ITCA predicates all these allegations on violations of fiduciary duties arising directly from AFLEA.
[8] The same is not true of the claims dismissed in 2024. These claims all alleged that DOI had released Collier's security in violation of the TFPA. Summary judgment was granted to the defendant based on the unchallenged evidence that showed the level of security remaining after the 1998 and 2007 releases of security remained above the level required by the TFPA. Therefore, the reconsideration in this opinion of the plaintiff's arguments in favor of summary judgment applies only to the claims rejected in 2023.

satisfied its fiduciary obligations to the plaintiff.  Granting summary judgment for the defendant on all Claim I allegations is appropriate.[9]

### B.    Claim I and ITCA's arguments

In *ITCA II*, the Federal Circuit held that "AFLEA, in combination with the TFPA, 'defines a fiduciary relationship' by providing that DOI was to 'hold in trust' security, at a level adequate to secure Collier's payment obligations, for the benefit of ITCA and the Navajo Nation."  956 F.3d at 1341 (quoting *White Mountain Apache Tribe*, 537 U.S. at 474.)  After concluding that AFLEA imposed a fiduciary duty on DOI to the plaintiff, the Federal Circuit vacated portions of the dismissal of Claim I and remanded for a determination of the scope of that fiduciary duty and whether DOI's actions breached that duty.

Claim I of the SAC focuses on how much collateral DOI was required to hold, and whether DOI upheld its fiduciary duty when the trust fund was under-collateralized at the time Collier defaulted on its payment obligations.  The plaintiff argues that the fiduciary duty imposed on the defendant by AFLEA required DOI to maintain sufficient security in the trust estate throughout the entire 30-year payment period to cover the full amount of the eventual sums Collier was to pay over the 30 years.  In support of that position, the plaintiff advances two separate arguments based on AFLEA.  Each argument, on its own, would support the imposition of a fiduciary duty on DOI to maintain sufficient security to cover the entirety of Collier's obligation.  Therefore, if the Act supports either argument, ITCA can demonstrate that DOI had a fiduciary duty to hold sufficient security to cover the entirety of Collier's obligations under the 30-year payment plan if Collier defaulted and DOI breached its fiduciary duty.

For its first argument, ITCA relies on the plain meaning of AFLEA.  It argues that AFLEA is a unique statute, and its provisions must be read to give effect to the broader congressional purpose of ensuring that the tribes affected by the closure of the Phoenix Indian School would receive the full benefit of the transaction.  To that end, ITCA asserts that the Act's use of the phrase "the security provided" in section 405(c)(2) of AFLEA must be read to require DOI to secure Collier's entire payment obligations under the 30-year plan set out in section 403(c)(2), which authorizes the 30-year payment option.[10]  The central issue to be resolved is whether the requirement that DOI "hold in trust the security" under the TFPA requires DOI to maintain sufficient collateral to secure Collier's obligation to pay $34.9 million and 30 years of interest payments or, instead, requires DOI only to maintain security in the amount established by the TFPA.

---

[9] Because this discussion revisits the plaintiff's argument, raised in the plaintiff's March 2023 motion for summary judgment, that the term "accrued interest" does not take on its ordinary meaning, both  parties' briefs from those motions (ECF 129, 137, 139, 140, 142, 143), as well as their briefs on the most recent motions (ECF 182, 184, 186, 188, 191, 192) were considered in resolving these cross-motions.

[10] Section 405(c)(2) of AFLEA provides:

> If a Trust Fund Payment is made in the form of annual payments under section 403(c)(2) of this title [allowing the 30-year payment option], the Secretary of the Treasury shall hold in trust the security provided in accordance with the Trust Fund Payment Agreement.

To support its argument that the plain language of section 405(c)(2) supports its position that the term "the security" in this section means security sufficient to cover Collier's entire 30-year obligation, as defined in section 403, ITCA also relies on extrinsic evidence. ITCA cites DOI's own internal memoranda from May and December 1992, prepared during the negotiation of the TFPA. ITCA argues that these memoranda reflect DOI officials expressing concern that, in the event Collier defaulted, DOI "would be obligated to make up the difference between Collier's 8.5 percent interest and the rate [the government is] able to earn by investing [the security held] in Government securities for the remainder of the thirty-year payment period." (ECF 184-1 at 35.) ITCA argues that the fact that DOI officials believed that DOI would have to make up the value of "Collier's missed payments" under the Act if Collier defaulted shows that during the time closest to enactment of AFLEA, the relevant DOI officials interpreted section 405(c)(2) in the same way ITCA does.

The plaintiff's reading of the Act and its reliance on extrinsic evidence as support for its reading is rejected. Section 405(c)(2) is clear and resolves the scope of the defendant's duties to the plaintiff. The plain meaning of section 405(c)(2) reflects that the Act defines "the security" by reference to the terms of the TFPA negotiated between and executed by DOI and Collier. Including the terms of the TFPA within the reading of section 405(c)(2) is the only way to give meaning to all the words within the section. The plaintiff's reliance on extrinsic evidence does not help it. The memoranda on which ITCA relies are irrelevant because extrinsic evidence cannot supplant the plain and unambiguous meaning of the Act and the TFPA. Even if they are considered, the memoranda do not provide any additional context that would support an argument that AFLEA should be interpreted any differently than its plain meaning requires.

For its second argument, ITCA proposes that even if AFLEA incorporates the TFPA and gave the defendant discretion in negotiating the TFPA to define the security DOI was required to maintain in the trust estate, the use of the term "accrued interest" in the portion of the TFPA defining the release-level amount required DOI to hold sufficient security to cover all 30 annual interest payments to be paid by Collier.

The plaintiff argues that AFLEA is a "unique" statute, designed to ensure the Arizona tribes received the benefit of the entire value of the Phoenix Indian School property over the 30-year period that Congress has authorized Collier to employ. (ECF 137-1 at 36.) The TFPA prohibited Collier from prepaying the annual payments, and Congress set the minimum rate of return at 8.5 percent in advance, without the ability to recalculate the interest rate in the future. (ECF 183-1 at 68); AFLEA, § 403(c)(5). ITCA argues that this unique scheme imposed at the outset the full scope of Collier's payment obligations, and the commensurate fiduciary obligation of the defendant to ensure Collier's entire obligation was paid to the trust fund and received by the tribes.

ITCA argues that although the Act uses the term "interest," Congress did not intend to create an interest agreement in the traditional sense. Rather, Congress intended to impose on Collier a separate payment obligation that was labeled as interest but did not "accrue" as interest typically does over time. In imposing this obligation on Collier to cover the full value of the property, the Act also imposes a like fiduciary obligation on the defendant.

The plaintiff's second argument is also rejected. Nowhere does the Act reflect a distinct definition for the term "accrued interest" that has a meaning other than its usual one. Neither the Act nor the TFPA, incorporated into the Act, contains any provision to ensure that interest due in

future years be recovered in the event of default. Even under the supposedly "unique" circumstances surrounding AFLEA, in the absence of any indication that Congress sought a unique definition of the term "accrued interest," that term must be given its usual meaning.

ITCA also cannot prevail on its claim that the defendant violated its fiduciary obligations under the Act and the TFPA.

DOI owed the plaintiff a duty under the TFPA to hold in trust the required security, regardless of how the security is defined. DOI admits that the value of the security being held in trust fell below the required threshold sometime before Collier defaulted on its payment obligations. *ITCA II*, 956 F.3d at 1340 n.11. Therefore, it must also be determined whether DOI breached its fiduciary duty by allowing the trust corpus to become undervalued or by not taking appropriate action once the trust corpus became undervalued or Collier defaulted.

ITCA argues that it is undisputed that DOI held insufficient security when Collier defaulted on its payment obligations. (ECF 184-1 at 43.) The Act's mandate included the duty to monitor the security that it held in trust. (ECF 184-1 at 36 n. 5.) ITCA relies on the TFPA to impose on DOI the obligation to monitor the value of the properties being held as security before releasing to Collier any portion of the security. ITCA argues that this duty implicitly carries the concomitant duty for DOI to monitor consistently the value of the security. (*See id*.) Given the changing market conditions, especially during and after the 2008 real estate bust, ITCA argues that DOI had to determine whether the trust estate still held sufficient security and, if it did not, DOI had the obligation to demand that Collier supplement the collateral. Because DOI failed to act until after Collier defaulted, ITCA asserts, it breached its fiduciary duty. (*See id*.)

ITCA's argument that DOI breached its fiduciary duty is rejected. Article 6.3 of the deed of trust imposed no requirement on DOI to monitor the value of the security in the trust estate and take any action, including notifying Collier, if it did. After Collier defaulted, DOI sued Collier *in rem* and recovered the value of all the accrued unpaid annual interest payments and the lump-sum payment. After the settlement was paid, the value of the trust estate was returned to the required minimum of 130 percent of the release-level amount. By acting with prudence after Collier defaulted, to repair the trust by obtaining the lump-sum payment and missed accrued interest payments, DOI met its fiduciary duty to hold security in trust for the plaintiff.

## C.    The meaning of "the security provided" in section 405(c)(2) of AFLEA

### 1.  Interpreting AFLEA

Fiduciary obligations owed by a federal agency to an Indian tribe can only be created by statute or treaty, which defines the scope of any such fiduciary obligations; such fiduciary obligations cannot be derived from the common law. *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 177 (2011). The Federal Circuit recently reiterated that fiduciary obligations owed by a federal agency to a tribe will not be inferred but must be found in the text of a statute or treaty. *Winnemucca Indian Colony v. United States*, — F.4th — , —, 2025 WL 2933946, at *4 (Fed. Cir. Oct. 16, 2025) (citing *Arizona v. Navajo Nation*, 599 U.S. 555, 566 (2023)).

The Federal Circuit has already held that AFLEA imposed on DOI a fiduciary duty to "hold in trust" the security required under the Act. *ITCA II*, 956 F.3d at 1341. As a result, the

first question left to determine on remand is the question of how much security DOI was required to hold to satisfy that duty. *Id.* at 1340 n. 11.

A statute is to be read as a whole, "'bearing in mind the fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *King v. Burwell*, 576 U.S. 473, 492 (2015) (quoting *Utility Air Regulatory Group*, 573 U.S. 302, 320 (2014)); *see also United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988). "[U]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). The words in a statute must also be read in its syntactic and grammatical context and not in isolation. *King v. St. Vincent's Hospital*, 502 U.S. 215, 221 (1991).

AFLEA's operative language that the parties dispute begins in Section 403. Section 403(a) requires that the "monetary proceeds [of the sale of the Phoenix Indian School property] shall be paid to the United States for deposit in the Arizona InterTribal Trust Fund and the Navajo Trust Fund in accordance with this section and section 405 of this title." Section 403(b) provides the Secretary with discretion to elect to receive the trust fund payment in the form of either a single lump-sum payment at the time the exchange is consummated or annual payments over 30 years, "calculated in accordance with subsection (c)." Section 403(c) requires the Secretary to consult with ITCA and execute a TFPA pursuant to which the annual payments will be made. Section 403(c) also specifies that, if the 30-year payment option is selected, the annual interest rate had to be set within a range of 8.5 to 9 percent.

Section 403 read together directs that once DOI accepted Collier's request for the 30-year payment option authorized by section 403(b), sections 403(c) and 405 became effective and operated to define the obligations imposed by the Act on DOI in establishing and implementing the trust fund.

Section 405 of AFLEA establishes how the proceeds will be deposited into the trust accounts and invested. Section 405 is titled "Establishment of the Arizona Indian Trust Funds." Section 405(c)(2) requires that, if Collier and DOI elect the 30-year payment option, payment is made in the form of the 30 annual payments authorized by section 403(c)(2), and DOI is to "hold in trust the security provided in accordance with the [TFPA]."

The language in Section 405(c)(2) is clear and resolves the scope of the defendant's duties to the plaintiff. Section 405(c)(2) requires the defendant to "hold in trust the security" as collateral when the 30-year payment option is selected.[11] The provision uses the definite article "the" in reference to "security." Using the definite article reflects that Congress had a single, specific notion of how "the security" under section 405(c)(2) is defined; under the provision there is no general notion of what "security" is to be held. Instead, the Act refers to specific

_____

[11] Section 405 requires the Secretary of the Treasury to hold the security required by the TFPA, not the Secretary of the Interior. ITCA had alleged a violation of AFLEA based on DOI holding the security instead of the Treasury Department, but this claim was dismissed by Judge Firestone and was not appealed. In *ITCA III*, the plaintiff was found to have forfeited any further argument on this claim. As such, "Interior" can be read wherever reference is made to the Secretary of the Treasury. 2023 WL 4881967 at *6. Therefore, this decision substitutes DOI whenever the Act refers to the Secretary of the Treasury.

"security." "The security" is defined as and limited by the next clause of the subsection: "in accordance with the Trust Fund Payment Agreement." To give content to the section, its language must be read together. Thus, "the security" referred to in the section is modified by the "in accordance with" clause. *See King v. St. Vincent's Hospital*, 502 U.S. at 221. Congress could have ended the sentence after "security provided" if it sought to apply a generic definition of "security" or if it had defined the term elsewhere in the Act. The Act does not, however, otherwise define "security." The Act defines the term in section 405(c)(2) in relation to another document, the TFPA. The Act's only definition of the term "the security" is made in specific reference to the TFPA. Any attempt to find in the Act some other definition of "security" ignores and renders meaningless the phrase "in accordance with the Trust Fund Payment Agreement" immediately following the reference to "the security" in subsection 405(c)(2). A reading that renders language referencing text that immediately precedes it within the same sentence surplusage is disfavored unless the context requires otherwise. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Ducan v. Walker*, 533 U.S. 167, 174 (2001)) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'")

The plain reading of section 405(c)(2) reflects that the Act defines "the security" by reference to the terms of the TFPA negotiated between and executed by DOI and Collier. To determine the scope of the fiduciary duty AFLEA imposed on DOI with respect to "the security," the provisions of the TFPA must be incorporated into section 405(c)(2). Congress effectively left the scope of the fiduciary obligation imposed on the defendant to be defined by the Secretary of the Interior when finalizing the TFPA. No other reading of section 405(c)(2) gives meaning to all the words of the provision. Thus, the relevant provisions of the TFPA, incorporated into the Act, determine the applicable definition of "security" and the scope of the defendant's related fiduciary obligations.

The TFPA consists of three documents: the Agreement itself, a promissory note, and a deed of trust. The deed of trust provides for the creation of security interests held by the trust estate in specific properties owned by Collier, as well as a security interest in Collier's annual deposits into an annuity. (ECF 183-1 at 8-9.) Combined, the two security interests create the collateral that secures Collier's promissory note. (*Id*. at 12.) The promissory note guaranteed that Collier would pay the principal amount at the end of 30 years and interest on the principal in 30 annual interest payments. (*Id*. at 67.)

The TFPA refers to the attached deed of trust for a detailed explanation of the security interests and the rights and obligations of Collier and DOI. Specifically, when Collier and DOI agreed to the TFPA, Collier granted and transferred all its rights and title to three Arizona properties to DOI as collateral. (*Id*. at 99.) The liens DOI held on these three Arizona properties represented the security required under section 405(c)(2). Article 6.2 of the deed of trust also contains a provision to allow Collier to request a "partial reconveyance" of the security at any time during the life of the 30-year agreement. (*Id*. at 103.) If Collier requested a reconveyance of any part of the security in the three Arizona properties, which it did in 1998 and 2007, the definition of "the security" DOI had to hold in trust under the Act necessarily changed.

Article 6.2 also specifies how the scope of the security would be revised if Collier requested a reconveyance and establishes the conditions under which a reconveyance could occur. Article 6.2 provides that the trust estate's liens on property held as security can only be

released if the security that remains in the trust estate after reconveyance remains valued at 130 percent of the release-level amount. (*Id*.)

The deed of trust defines the release-level amount as:

> (i) the unpaid principal plus accrued interest on the Promissory note, less (ii) the value of United States Government-backed Securities and Deposited Monies held in the Trust Estate, and further less, after the expiration of two years from the Closing Date (as such term is defined in the Trust Fund Payment Agreement) (iii) the fair value, at the time of the calculation, of the Annuity.

(*Id*.)

If any security is reconveyed to Collier, the remaining security in the trust estate must remain valued at or above the 130-percent release-level amount threshold. If the value of the security falls below the 130-percent threshold, Collier was required under Article 6.3 to provide to the trust estate government-backed securities sufficient to restore the value of the security to 130 percent of the release-level amount. (*Id*. at 104.)

Under the terms of the TFPA, incorporated into section 405(c)(2) of AFLEA, the three properties on which DOI held liens secured Collier's obligation, regardless of any fluctuations in the value of the properties over time. Once Collier requested and was granted the first reconveyance of a portion of the security in 1998, the definition of "the security" to be maintained was no longer the three properties on which DOI originally held liens. Under the TFPA, after the first reconveyance, DOI was required to maintain "the security" at 130 percent of the release-level amount. The security could be made up of any combination of the value of the remaining properties on which DOI held liens, the fair value of the annuity, government-backed securities, or money that was equal to or greater than 130 percent of the unpaid principal and accrued interest. (ECF 183-1 at 103-04.)

The plain meaning of AFLEA, when read to incorporate the provisions of the TFPA, does not obligate DOI to maintain security to cover the entirety of Collier's obligation to pay 30 annual interest payments and its lump-sum payment. ITCA has an additional argument, however, in favor of its interpretation of the Act.

### 2. Extrinsic evidence

The plaintiff argues that a reading of the Act to require security sufficient to equal 130 percent of the release-level amount and not the entirety of Collier's payment obligation is incorrect. ITCA argues that the statutory language supports its reading of AFLEA that DOI was required to hold throughout the 30-year obligation, authorized by section 403, sufficient security to cover the entire amount Collier was supposed to pay to the trust estate over the life of the arrangement.

To support this argument, ITCA relies on the extrinsic evidence from DOI's internal memoranda outlining its own views on its security obligation at the time when the TFPA was being negotiated. Whatever value these internal memoranda may have, they cannot supplant the meaning of the Act and the TFPA when both are clear and unambiguous on their face.

In interpreting a statute "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992). Thus, when the text of a statute is unambiguous, as the text of AFLEA is, the interpretation of the statute begins and ends with its text. *Id.*, at 254; *see also Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450 (2002) ("[a]s in all statutory construction cases, we begin with the language of the statute. The first step 'is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.' The inquiry ceases 'if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent'") (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). Even if the legislative history of a statute contradicts the text of the statute, courts "do not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994).

Because the meaning of AFLEA's text is clear on its face, it is impermissible to resort to extrinsic evidence to interpret it. If the extrinsic evidence on which ITCA relies were considered, however, it would not produce a contrary interpretation, because the evidence on which ITCA relies does not support its interpretation of AFLEA. The plaintiff relies on DOI memoranda prepared for the Secretary by the Assistant Secretary for Indian Affairs and Assistant Secretary for Fish and Wildlife Parks in May and December 1992, during the negotiation and finalization of the TFPA.

In the May 1992 memorandum, the assistant secretaries advised the Secretary that he had the "authority and discretion" to define Collier's payment of the $34.9 million lump sum and 30 annual interest payments as either "a contractual obligation" or a "normal business obligation."[12] (ECF 184-3 at 4-5.) They advised the Secretary that if he determined that the agreement between DOI and Collier was treated as a "contractual obligation," then, in the event Collier defaulted, DOI would have to make up the difference between Collier's 8.5 percent interest and the rate the trust estate would have been able to earn by investing in government securities for the remainder of the 30-year payment period. (ECF 184-3 at 5.) If the agreement was to be treated as a "normal business transaction," "Collier would be obligated to make the 8.5 percent interest payments, and in default, that obligation would continue only to the point that Collier's collateral was liquidated, and the $34.9 million in princip[al] was recovered." (*Id.*) The assistant secretaries recommended that the Secretary treat the land exchange as a "normal business transaction" to minimize the financial risk to DOI. (*Id.* at 5-6.) The final TFPA reflected this recommendation and, therefore, this memorandum supports the argument, contrary to the plaintiff's argument, that under the final version of the TFPA DOI is not obligated to secure all 30 of Collier's annual interest payments if Collier defaulted.

---

[12] The May memorandum defines a "contractual obligation" as one in which Collier would guarantee to make 30 annual payments and the lump-sum payment, with a pledge of sufficient collateral for DOI to recover both the full principal and the remaining stream of annual interest payments if Collier defaulted. (ECF 184-3 at 4.) The memorandum defines a "normal business transaction" as one in which Collier's $34.9 million lump-sum payment obligation would be secured by a note requiting 30 annual interest payments at 8.5 percent, with a ballon payment of the full principal due at the end of 30 years, and a pledge of sufficient collateral to recover the full principal in the event of a default.

ITCA cites to the portion of the memorandum in which the assistant secretaries explain to the Secretary that if the land exchange is treated as a "contractual obligation," then DOI would have to ensure that Collier pledges enough collateral to secure both the lump-sum payment and the amount of any deficiency in interest, whether yet accrued or due in the future. (ECF 184-1 at 35.) If DOI did not obtain from Collier sufficient collateral to secure both the lump sum and the entire 30 years of interest payments and Collier were to default, the memorandum counseled that "the Government would be obligated to make up the difference between Collier's 8.5 percent interest and the rate it was able to earn by investing in Government securities for the remainder of the thirty year period." (ECF 184-3 at 5.) The plaintiff repurposes this quote as evidence that DOI knew its obligation was to secure the lump sum and all 30 years of annual interest payments. (ECF 184-1 at 34-35, 43.) This interpretation is incorrect and reads the quoted text out of context.

The assistant secretaries were not writing to inform the Secretary of DOI's obligation if Collier defaulted. Instead, the memorandum was prepared to give the Secretary guidance regarding which approach to pursue in negotiating the TFPA. In the end, by using terms such as "accrued interest," "principal amount," and "annual interest payment," common to routine business transactions, the TFPA ultimately reflected not a "unique" transaction, as argued by ITCA, but rather a normal business transaction. This May 1992 memorandum provides no evidence to support ITCA's assertion that the land exchange was "a carefully crafted unique payment scheme." (ECF 137-1 at 36.) Just the opposite is true. Thus, even were the memorandum to be considered in interpreting the Act and the TFPA, it provides no solace to the plaintiff.

In a second memorandum from December 1992, the same assistant secretaries addressed the adequacy of Collier's proposed collateral to secure its 30-year obligation. (ECF 184-5 at 5.) DOI had publicly stated prior to the date of the memorandum that Collier's "collateral would have to be 130 [percent] of the $34.9 million." (*Id*.) The value of the collateral Collier was proposing, however, amounted only to between 101 and 107 percent of the lump-sum obligation. (*Id*.) The assistant secretaries expressed concern that, if DOI accepted Collier's offer of collateral valued at less than 130 percent of $34.9 million, the Arizona tribes would litigate the change in DOI's position. (*Id*.)

The assistant secretaries acknowledged there was a "real potential for financial liability," and that a Collier default "will expose the United States to serious litigation with the tribes." (ECF 184-5 at 10.) The plaintiff argues that the assistant secretaries had concluded that if Collier defaulted, then DOI "would be obligated to make up the difference between Collier's 8.5 percent interest and the rate [the government is] able to earn by investing [the security held] in Government securities for the remainder of the thirty-year payment period." (ECF 184-1 at 35.) The plaintiff relies on this internal concern to argue that during the drafting of the TFPA the DOI officials most familiar with AFLEA and the TFPA understood that section 405(c)(2) required just what the plaintiff argues here, that DOI is liable under its fiduciary duties to make good the value of all of Collier's payments over the life of the 30-year obligation.

To begin, the December 1992 memorandum appears to reflect a misunderstanding of DOI's obligations under the Act. The authors of the memorandum may have been expressing a generalized concern about a possible judicial interpretation of the Act and the scope of DOI's fiduciary obligations, but the memorandum itself did not provide any textual or legal analysis of

the Act to support the assistant secretaries' concerns. Rather, the memorandum largely addresses the state of the ongoing negotiations of the TFPA with Collier. The memorandum notes that "[t]he tribes may litigate" the disputed amount of security Collier needed to provide, and acknowledges that "if [DOI] lose[s] the litigation, the United States may be financially liable." (ECF 184-5 at 5.) Indeed, that is what happened. ITCA sued DOI in the District of Arizona in October 1992 to block DOI from proceeding with the land exchange on the terms to which DOI and Collier had agreed, but its suit was rejected. *See Inter-Tribal Council of Az. v. Lujan*, No. 2:92-cv-01890 (D. Ariz. Oct. 8, 1992).

The December 1992 memorandum merely reflects the uncertainty inherent in potential future litigation over how a court may interpret the Act and the TFPA; it is not a legal opinion and does not advance the plaintiff's argument. Indeed, the December 1992 memorandum reveals that the tribes were aware of the negotiations to determine the amount and content of Collier's security. The tribes were provided with copies of the TFPA for comment, and DOI requested the opportunity to brief the tribes. (ECF 184-5 at 5.) The tribes were aware of DOI's position that accepting Collier's proposed collateral in the range of 101 and 107 percent of the $34.9 million was the only way to move forward with the land exchange, even though the value of the collateral was less than what DOI had announced it would be. (*Id.*) The tribes were also aware that DOI believed the Act gave the Secretary broad discretion to determine the amount of the collateral Collier had to provide, and whether it was sufficient to secure the land exchange. (*Id.* at 9.) Now, 33 years later, the plaintiff argues the Secretary was not properly exercising his discretion when he determined both the type and amount of collateral DOI would accept in the TFPA. As with the May 1992 memorandum, this memorandum also supports the interpretation of the Act that the Secretary had discretion to determine the amount of collateral security to be provided under the TFPA and reflects a consistent interpretation by DOI since 1992.

The statutory language, when read to incorporate the terms of the TFPA, reveal that DOI had discretion to determine the amount of security it needed to hold to ensure Collier's compliance with the terms of the sale. ITCA's first argument in support of its position is rejected.

### D.    The meaning of "accrued interest" in the TFPA

In addition to arguing that AFLEA's provisions must be read to give effect to the broader congressional purpose of ensuring that the tribes affected by the closure of the Phoenix Indian School would receive the full benefit of the transaction, the plaintiff also argues that if the TFPA is incorporated into the statute, the term "accrued interest" in the TFPA refers to all 30 interest payments and not just those that had become due by the time of Collier's default. The plaintiff argued that while payments accrue on an annual basis in a normal loan arrangement, the Act is "a carefully crafted, unique payment scheme" that requires the legal term "accrue" to be interpreted differently. (ECF 137-1 at 36.) The Act explicitly requires 30 annual payments at a minimum interest rate of 8.5 percent on the $34.9 million lump-sum payment Collier owed. Congress did not make any of these payments optional or allow for the payments to be prepaid. (ECF 137-1 at 37.)

In addition to its terms becoming an integral part of the statute, the TFPA is a contract between Collier and DOI. As when interpreting a statute, "[w]here contract provisions are clear and unambiguous, they must be given their plain and ordinary meaning." *Alaska Lumber & Pulp Co. v. Madigan*, 2 F.3d 389,392 (Fed. Cir. 1993) (citing *George Hyman Constr. Co. v. United*

*States*, 832 F.2d 574, 579 (Fed. Cir. 1987)).  To determine the ordinary and contemporary meaning of a term, dictionaries and similar resources may be used.  *Massachusetts Mut. Life Ins. Co. v. United States*, 782 F.3d 1354, 1367 (Fed. Cir. 2015).

The deed of trust, one of the three documents incorporated into the TFPA, employs the term "accrued interest" in its definition of the "release-level amount."  Specifically, in Article 6.2, the deed of trust provides: "'Release Level Amount' means: (i) the unpaid principal plus *accrued interest* on the Promissory Note."  (ECF 183-1 at 103) (emphasis added.)

"Accrued interest" is defined as "interest that is earned but not yet paid."  *Black's Law Dictionary* (12th ed. 2024) (defining "accrued interest"), available at Westlaw.  Alternatively, "present interest" is defined as "a trust interest in which the trustee has the immediate right to control and manage the property in trust," and "future interest" is defined as "a property interest in which the privilege of possession or of other enjoyment is future and not present."  *Black's Law Dictionary* (12th ed. 2024) (defining "Present interest (3)"), available at Westlaw; *Black's Law Dictionary* (12th ed. 2024) (defining "Future interest"), available at Westlaw.  Thus, "accrued interest" is fundamentally different than future interest, and interest does not normally accrue all at once, but instead reflects a value for the cost of money that accumulates over time.  Typically, a lender forecloses on collateral to recover the unpaid principal and unpaid accrued interest but not interest that has yet to become due, and thus not yet accrued.

In a traditional secured transaction, a secured lender forecloses on collateral to recover the unpaid principal and unpaid accrued interest.  *See Hicks v. Capitol Am. Life Ins. Co.*, 943 F.2d 891, 894 (8th Cir. 1991.)  A secured lender does not typically recover future interest.  *Id.*  This general principle flows from the "basic finance principle that a dollar today is worth more than a dollar tomorrow . . . [and, therefore] it would be inappropriate to award damages today based on unearned future interest."  *Id.* at 895.  Security and collateral are rarely intended to cover interest payments that have not become due yet.  At common law, interest is treated as if it accrues daily, regardless of when it was payable.  *See Fowler v. Guerin*, 899 F.3d 1112, 1118-19 (9th Cir. 2018).  In some cases, interest accrues annually.  *See Cuyuna Realty Co. v. United States*, 382 F.2d 298, 300 (Ct. Cl. 1967).  Absent some indication that a distinct meaning was intended, the term "accrued interest" in the TFPA can be read only to cover interest that is earned daily or yearly, becoming due and payable on a specified date, and already paid into the trust estate or is past due.

Under the TFPA, each interest payment is designated as an "Annual Interest Payment."  (ECF 183-1 at 67.)  Collier's entire interest obligation is defined as "thirty consecutive annual interest payments."  (*Id.*)  The promissory note defines when Collier's annual interest payment became due at the end of the calendar year.  (*Id.* at 67, 103.)  Under the express terms of the TFPA, "accrued interest" can only refer to Collier's annual interest payments that have been paid into the trust estate or are past their annual due date.  The TFPA gives no hint that unpaid interest payments due in the future of the 30-year obligation are within the TFPA's definition of "accrued interest."

The plaintiff argues that despite the usual definition of the term and the legal principles applicable to it, AFLEA is "a carefully crafted, unique payment scheme" that requires a distinct definition of the TFPA's use of the term "accrued interest."  (ECF 137-1 at 36.)  ITCA argues that when the Act allowed Collier to forgo its lump-sum payment obligation for 30 years, until 2026, it sought to replicate the effect of a 30-year bond by setting and cementing an interest rate

between 8.5 and 9 percent to be paid annually by Collier for 30 years, when the lump sum would be due. AFLEA, § 403(c)(5). ITCA also points to the inclusion in the promissory note of a provision denying Collier the right to prepay any of its annual interest payments or its lump-sum principal payment. (ECF 183-1 at 68.) From this combination of provisions, ITCA deduces that the Act was crafted to ensure that the Arizona tribes would receive the same benefits from the 30-year payment option as they would have received from Collier's payment of the $34.9 million lump sum upfront and the immediate investment of those funds in a guaranteed federal 30-year bond.

Even though aspects of AFLEA and the payment structure created in the TFPA are unusual, nothing in the Act reflects a distinct definition for the term "accrued interest" such that it would have a meaning other than its usual one. Neither the Act nor the TFPA, incorporated into the Act, contains any provision to ensure that interest due in future years be recovered in the event of default. Indeed, as noted, the use of the term "accrued" points in the opposite direction. The plaintiff has not provided a single example of an agreement or a judicial precedent in which all future interest payments required in an agreement but due annually "accrued" at the beginning of the agreement. Even under the "unique" circumstances surrounding AFLEA, in the absence of any indication that Congress sought a unique definition of the term "accrued interest," that term must still be given its normal meaning.[13]

### E.    DOI Did Not Breach a Fiduciary Duty to ITCA

AFLEA, with the TFPA incorporated into it, required DOI to hold in security enough collateral so that the trust fund remained valued at or above 130 percent of the release-level amount. If DOI breached that obligation, it can be held liable for any damages to the trust resulting from that breach. *ITCA II*, 956 F.3d at 1342. The fiduciary obligation imposed by the Act on DOI was coterminous. The release-level amount included the principal amount, the interest that had accrued at the time of default and was unpaid, and the interest that continued to accrue during the litigation against Collier. As explained above, the release-level amount did not include the entire 30 years of annual interest payments.

The plaintiff argues both that DOI held insufficient security at the time Collier defaulted and that the trust fund had become undercollateralized before Collier's default. (ECF 184-1 at 43.) The plaintiff argues that DOI's fiduciary duty to maintain adequate security included a duty to monitor the value of the security held over time, especially as the security was held in real property, whose value can be volatile, as it proved to be in 2008. (ECF 184-1 at 36 n. 5.) The plaintiff derives this obligation from the TFPA's requirement that DOI evaluate the value of the security before any reconveyance. On this basis, the plaintiff argues that the TFPA imposed on DOI the duty to demand that Collier supplement the security with government-backed securities when the trust fund became undercollateralized, as it did when real estate prices fell

---

[13] The plaintiff's argument relying on the purportedly unique aspects of the land exchange would not yield a different outcome, even if it were correct. If the Act had been intended to mimic the effect of investing the principal in a 30-year bond, the outcome would be the same. No matter when a default occurs during the term of a bond, interest is only accrued up to the time of default, unless a contrary intent can be found in the contract or a statute. *See Smyth v. United States*, 302 U.S. 329, 353-54 (1937). Here, the Act and the TFPA reflect that normal usage, and neither reflects ITCA's approach.

precipitously in 2008. DOI's failure to monitor the value of the assets held as security in the trust caused DOI to fail to act prudently until after Collier defaulted. According to ITCA, DOI therefore breached its fiduciary duty to ITCA.

When Congress imposes a fiduciary relationship on the United States and provides it with discretionary or plenary control over the trust estate, the duties of a trustee at common law are presumptively applied to the government. *See White Mountain Apache Tribe*, 537 U.S. at 466; *Hopi Tribe*, 782 F.3d at 668 ("[B]y using trust language in conjunction with an authorization of plenary control of the [property], Congress clearly accepted a fiduciary duty to exercise that authority with the care charged to a trustee at common law").

When a statute imposes a fiduciary duty on the government, Congress can also limit the extent to which the government must adhere to the fiduciary duties imposed at common law. In *Jicarilla Apache Nation*, the Supreme Court held that Congress may style its relationship with Indians as a trust without assuming all the fiduciary duties of a private trustee. Instead, Congress may "creat[e] a trust relationship that is 'limited' or 'bare' compared to a trust relationship between private parties." 564 U.S. at 174 (quoting first *United States v. Mitchell (Mitchell I)*, 445 U.S. 535, 542 (1980); then quoting *United States v. Mitchell (Mitchell II)*, 463 U.S. 206, 224 (1983)). In *Jicarilla*, the Supreme Court determined that a statute requiring an agency to "'supply account holders with periodic statements of their account performance' and must make 'available on a daily basis' the 'balances of their account'" did not require the agency to comply with any additional obligations usually required under the common-law fiduciary duty to disclose but only required compliance with its specific terms. 564 U.S. at 185 (*quoting* 25 U.S.C. § 162a(d)(5)).

The Federal Circuit recently reiterated that it will not infer that the government has an affirmative duty to act on fiduciary obligations created from common law doctrine but not found in the text of the treaty. *Winnemucca Indian Colony*, — F.4 at —, 2025 WL 2933946, at *4 (citing *Arizona v. Navajo Nation*, 599 U.S. 555, 566 (2023)). Fiduciary duties found in a statute are specific to and constrained by the statute. General provisions and directions do not imply and will not support the creation of non-specified fiduciary duties on the government. *See Ute Indian Tribe of the Uintah & Ouray Indian Resv. v. United States*, 99 F.4th 1353, 1365 (Fed. Cir. 2024) (a general instruction to protect the rights and interests of a tribe was not specific enough to create a duty to secure new water for the tribe).

The common-law duty to preserve trust assets includes the requirement that the trustee "tak[e] reasonable steps to enforce or realize on other claims held by the trust and to defend actions that may result in a loss to the trust estate. Reasonable steps may include taking an appeal to a higher court, compromise or arbitration of claims by or against the trust, or even abandoning a valid claim or not resisting an unenforceable claim if the costs and risk of litigation make such a decision reasonable under all the circumstances." Restat.3d of Trusts, § 76 (2012); *see also Ute Indian Tribe of the Uintah & Ouray Indian Reservation*, 99 F. 4th at 1369; *White Mountain Apache*, 537 U.S. at 475 (citing, *inter alia*, Restatement (Second) of Trusts § 176 (1957)). Further, a "trustee also owes to the beneficiaries a duty to act with prudence—that is, to use reasonable care and skill [ ] to preserve trust property. This duty includes the use of reasonable care to protect trust property from loss or damage… and bring such actions as a prudent person would for the protection and preservation of trust property." Restat.3d of Trusts,

§ 76 (2012). For example, it is ordinarily the duty of the trustee to "bring such actions as a prudent person would for the protection and preservation of trust property." *Id.*

The plaintiff argues that the defendant's duty to preserve the security held in the trust implicitly created a concomitant duty to monitor continuously the value of the security to ensure it remained above the 130-percent release-level amount. The requirements of the deed of trust are not so broad. The deed of trust requires DOI to monitor the value of the security in the trust only when Collier sought reconveyance of any asset. (ECF 183-1 at 103.) At the time of reconveyance, DOI must ensure the value of the security remaining in the trust, together with the funds deposited in the annuity, exceed 130 percent of the release-level amount. No other duty is specified.

In both 1998 and 2007, Collier requested reconveyances of security. In both instances, Collier provided DOI with appraisals showing that the remaining property in the trust was valued at more than 130 percent of the release-level amount. (ECF 154 at ¶¶ 20, 28.) Therefore, as was determined on the parties' cross-motions for summary judgment in 2024 (*see* footnote 8, above), DOI adhered to its fiduciary duty to monitor the trust by reviewing the trust estate before each partial reconveyance.

Once Collier requested and DOI granted a partial reconveyance of property, the TFPA imposed on Collier, *not* on DOI, the affirmative duty under Article 6.3 of the deed of trust to maintain the collateral at a value more than 130 percent of the release-level amount. (ECF 183-1 at 104). The deed of trust obligated Collier to replenish the trust by adding sufficient government-backed securities to restore the required level of security. If this obligation implies a concurrent obligation to monitor the value of the security on a continuous or routine basis, then the deed of trust imposes that obligation on Collier. Article 6.3 imposed no requirement on DOI to monitor the value of the security in the trust estate and notify Collier when the additional investment from government-backed securities was required. The plaintiff fails to explain how the deed of trust imposing an affirmative obligation on Collier should also be read to impose a like implicit obligation on DOI. A common law duty delegated to another party in the Act, incorporating the TFPA, may not be imposed on the government.[14] *See Jicarilla Apache Nation*, 564 U.S. at 177-78.

---

[14] Although the Act imposes no duty on DOI to monitor the value of the security, even if such a duty could be imputed and its substance derived from common law, it would not affect the outcome. When the government breaches a fiduciary duty owed to a tribe, "the Government should be liable in damages for the breach of its fiduciary duties." *Mitchell II*, 463 U.S. at 226. "Courts determine the amount of damages for such a breach by attempting to put the beneficiary in the position in which it would have been absent the breach." *Jicarilla Apache Nation v. United States*, 112 Fed. Cl. 274, 304 (2013) (citing *Conf. Tribes of Warm Springs Reservation of Oregon v. United States*, 248 F.3d 1365, 1371 (Fed. Cir. 2001)). DOI is not the guarantor of Collier's payment obligation and was not required to ensure Collier made its payments through 2026. *ITCA II*, 956 F.3d at 1345-46. The Act and the TFPA only required DOI to hold security valued at 130 percent of the release-level amount in trust, an amount that only included the principal and accrued interest, not future interest. When the United States sued Collier, it correctly calculated the release-level amount at $43,485,224. (ECF 154-1 at ¶ 48.) The share of the settlement recovery that went to ITCA was approximately $45.6 million, bringing the value

DOI did have an implicit duty to act prudently to protect and preserve the security in the trust estate. Restat. 3d of Trusts, § 76 (2012). Under this duty, DOI had to act with reasonable care and skill to preserve the trust property when it knew the value of the trust property was at risk. *Id*. In such a case, the TFPA again outlined how DOI would proceed under its fiduciary obligation to protect and preserve the trust. The TFPA authorized DOI to sue Collier *in rem* if Collier defaulted. (ECF 183-1 at 68.)

DOI admits that at the time Collier defaulted, the trust estate had become "under-collateralized." *ITCA II*, 956 F.3d at 1340 n.11. According to the Federal Circuit, DOI had a fiduciary obligation to "hold in trust" the security provided. *ITCA II*, 956 F.3d at 1341. If DOI had taken no action when Collier defaulted, DOI would have breached its fiduciary duty.

After Collier defaulted and notified DOI that it no longer planned to pay any of its obligations, DOI twice requested in 2013 that Collier meet its obligations under the Act and TFPA. (ECF 183-6; ECF 183-7.) When Collier refused and reaffirmed that it would no longer make its annual payments, DOI sued Collier *in rem* in January 2014, approximately 13 months after Collier defaulted. DOI and Collier then settled, and DOI recovered the value of all the accrued, unpaid annual interest payments and the lump-sum payment. After the settlement was paid, the value of the trust estate was returned to the required minimum of 130 percent of the release level amount. By suing Collier and recovering the full value of the principal and the unpaid, accrued interest, DOI acted in accordance with the authority it was granted under the TFPA. Nothing more was required.

## VI.    CONCLUSION

ITCA opposed allowing Collier 30 years to pay the principal for its acquisition of the Phoenix Indian School property. From the long and unfortunate history of treatment of the indigenous people of the country, ITCA feared it would not see the full benefits if the 30-year payment option were selected. That fear was borne out when the real estate market suffered in 2008, and Collier defaulted on its obligations to DOI and, ultimately to the plaintiff. The injury ITCA and its members have suffered cannot, however, be remedied here.

AFLEA allowed DOI the flexibility to determine the extent and content of the security to be held in the trust estate by leaving those matters to resolution in the TFPA. Under the terms of the TFPA, incorporated into AFLEA, DOI did not have to maintain sufficient security to ensure the plaintiff would receive all 30 years of Collier's obligation if Collier defaulted. Additionally, the TFPA's use of the term "accrued interest" encompasses only Collier's annual interest payments that had become due, not the unpaid balance of future payments. While DOI could have been more diligent in its management of the trust estate, the defendant satisfied its fiduciary obligations by suing Collier and recovering the settlement amount that remedied the shortfall in the level of security in the trust estate. The defendant therefore acted prudently and reasonably

---

of the trust fund back above 130 percent of the release-level amount. (ECF 154-1 at ¶ 52.) Therefore, if a breach of DOI's fiduciary duty caused the trust fund to fall below the 130 percent level, the subsequent settlement with Collier replenished the trust fund to its required level. Thus, even if a fiduciary duty was breached, the plaintiff has already been put in the position it would have been absent the breach and can show no injury.

when Collier defaulted and satisfied the duties imposed on it by AFLEA, incorporating the TFPA.

Accordingly, the defendant's motion for partial summary judgment (ECF 182) is granted, and the plaintiff's motion for partial summary judgment is denied (ECF 184). A separate order reflecting this determination will be entered concurrently with this opinion.

s/ Richard A. Hertling

**Richard A. Hertling**
**Judge**